UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
STEVEN SCHWARTZ,

                                          Plaintiff,

                 -against-

ALLSTATE INSURANCE COMPANY,

                                          Defendants.
------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
20-CV-79 (JMA) (JMW)

FILED
CLERK

1:12 pm, Mar 31, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Plaintiff Steven H. Schwartz ("Plaintiff")—a Jewish man born in 1956—alleges that Defendant Allstate Insurance Company ("Allstate") discriminated against him based on his age and religion in violation of the Title VII, the ADEA, and the New York State Human Rights Law ("NYSHRL"). Plaintiff also alleges that Defendant retaliated against him for complaining about a hostile work environment. Currently pending before the Court is Defendant's motion for summary judgment. For the reasons set out below, Defendant's motion is GRANTED.

## I. BACKGROUND

Plaintiff's response to Defendant's motion for summary judgment is patently deficient under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"). As explained below, the Court deems admitted the undisputed facts set out in Defendant's 56.1 Statement that Plaintiff has failed to properly controvert. The Court sets out those facts, which have been deemed admitted, below. Plaintiff has also waived any argument that the Court should consider any other potential evidence in the record.

And, assuming _arguendo_ that the Court should nevertheless still consider the entire record, the Court also lays out, _infra_, a further recitation of the facts based on a review of the underlying record in this case.

## A.  **Facts Deemed Admitted and Undisputed Pursuant to Local Rule 56.1**

### 1.  **Local Rule 56.1**

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact.  Local Rule 56.1(a), (d).  The papers of the party "opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Rule 56.1(b).  If the opposing party fails to specifically controvert a fact set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.  Local Rule 56.1(c).  Each statement by the opponent controverting "any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

Defendant followed Local Rule 56.1 by setting out specific factual assertions and by citing to specific evidence in the record in support of each of those assertions.  Plaintiff's 56.1 statement is patently deficient and does not comply with the Local Rule 56.1.  Plaintiff purports to "dispute" various paragraphs in Defendant's 56.1 statement.  Plaintiff's 56.1 statement, however, does not cite to specific evidence in the record.  At certain points, Plaintiff's 56.1 Statement generally references his deposition testimony, but does not cite to any specific pages of the deposition.  Plaintiff also does not cite to any specific pages from the deposition of his supervisor, Vincent

Ferrara.  A plaintiff does not "properly controvert" an asserted fact in a 56.1 statement by citing to an "entire deposition transcript without a point cite."  Russell v. Aid to Developmentally Disabled, Inc., 753 F. App'x 9, 12–13 (2d Cir. 2018).  Additionally, in response to ten factual assertions in Defendant's 56.1 statement, Plaintiff responds that "Defendant lacks sufficient information to form a belief as to the truth of this statement."  This statement and other similar statements in Plaintiff's 56.1 are not sufficient responses under Local Rule 56.1 when, as here, the defendant has cited to admissible evidence in support of its factual assertions.  See Russell, 753 F. App'x at 12 (finding that response by the plaintiff that she "lacks sufficient knowledge or information to admit or deny" a fact is insufficient under Local Rule 56.1)

Plaintiff's papers also do not include additional numbered "paragraphs containing…separate, short and concise statement[s] of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Rule 56.1(b).  Instead, Plaintiff simply makes factual assertions throughout his opposition brief.  For some of these assertions, Plaintiff cites to the record.  For other factual assertions, no citation is provided.

Given Plaintiff's deficient response to the motion, the Court deems admitted all the factual assertions in Defendant's 56.1 that are supported by admissible evidence in the record.  The Court has independently reviewed the factual assertions set out in Defendant's 56.1 Statement and the evidence Defendant cited in support of those factual assertions.  The Court deems admitted all factual assertions from Defendant's 56.1 statement that are supported by the evidence Defendant cites.  Those admitted and undisputed facts are set forth below.  The Court does not consider additional factual assertions made in Plaintiff's brief as Plaintiff failed to comply with Local Rule 56.1(b).

## 2.  Facts Deemed Admitted

Plaintiff was born in 1956 and self-identifies as Jewish.  (Pl. 56.1 Statement ("Pl. 56.1") ¶ 1.) Def. 56.1 Statement ("Def. 56.1") ¶ 1.)  He began his employment with Allstate Insurance Company as a Financial Specialist on December 28, 2018.  (Id. ¶ 2.)  This position was entirely commission based.  (Id. ¶ 3.)

Plaintiff was required to pass the FINRA Series 6 and 63 exams within three months of starting his employment. (Def. 56.1 ¶ 19.)  Plaintiff, however, did not pass the FINRA Series 63 exam.  (Id.)

Plaintiff's employment ultimately ended in August 2019.  Plaintiff did not sell a single insurance policy during his eight-month tenure with Allstate.  (Pl. 56.1 ¶ 20.)

Plaintiff initially reported to Ivan Holtzer and was responsible for the Queens region.  (Pl.'s 56.1 ¶ 4.)  Holtzer provided Plaintiff with two leads.  (Def. 56.1 ¶ 5.)  In January 2019, Vincent Ferrara became Plaintiff's manager.  (Def. 56.1 ¶ 6.)

Ferrara held monthly in-person meetings with his sales staff.  (Def. 56.1 ¶ 7; Ferrara Dep. 34–36.[1])  (In February, Ferrara asked Plaintiff why he was not writing any business, and Plaintiff did not have an explanation.  (Def. 56.1 ¶ 9.)  Although Plaintiff was introduced to Michael Kalkin to assist with his sales, Plaintiff soon stopped showing up to Mr. Kalkin's location and only contacted one client.  (Id. ¶ 10.)

In March 2019, Ferrara called to check-in with Plaintiff.[2]  (Def. 56.1 ¶ 11.)  Plaintiff explained that he was in California taking care of family business. (Def. 56.1 ¶ 11.)  Ferrara also

---

[1]  Although the two pages of deposition testimony cited by Defendant—pages 26 and 27—do not concern meetings, on pages 34 and 35 of his deposition Ferrara addresses meetings.  (Ferrara Dep. 34–36.)

[2]  Defendant's 56.1 Statement asserts that this call happened in "May 2019."  (Def. 56.1 ¶ 11.)  The testimony cited in Defendant's 56.1 Statement does not state that this conversation occurred in May 2019.  However, Ferrara indicates, on page 61, and at other points in his deposition, that the conversation occurred in March 2019.  (See Ferrara Dep. 54, 61–63.)

brought up the fact that Plaintiff did not yet have his securities license.  (Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13.)  After this call, Plaintiff did not respond to any of Ferrara's texts, emails, or phone calls, nor did he attend weekly or monthly meetings.  (Def. 56.1 ¶ 14.)

On August 12, 2019, Ferrara sent an email to Nancy Feustel—an employee in Human Resources ("HR")—stating that Plaintiff had disappeared.  (Def. 56.1 ¶ 15.)  Feustel wrote to Plaintiff on August 13, 2019, requesting that Plaintiff appear for a meeting on August 15, 2019, or Allstate would consider his employment voluntarily terminated.  (Def. 56.1 ¶ 16.)  Feustel then emailed Plaintiff on August 15, 2019, requesting that Plaintiff appear for a meeting on August 19, 2019, or Allstate would consider his employment voluntarily terminated.  (Def. 56.1 ¶ 17.)  Plaintiff, however, did not attend either meeting.  (Def. 56.1 ¶ 19.)

Plaintiff's employment was terminated due to job abandonment on August 19, 2019.  (Def. 56.1 ¶ 21.)

**B.  <u>Additional Undisputed Facts Based on a Review of the Entire Record</u>**

Assuming <u>arguendo</u> that the Court should still review the entire record, additional facts from the entire record are set below.

Plaintiff contends that he did not receive sufficient leads to allow him to earn any commissions and was ignored by his supervisor, who, according to Plaintiff, told Plaintiff that he would not have hired an "old Jewish guy" for Plaintiff's territory in Queens.  Ferrara maintains that Plaintiff did not receive additional leads because he stopped communicating with Ferrara and failed to obtain the required Series 63 license to sell securities.  As for Plaintiff's termination, Allstate contends that Plaintiff was ultimately terminated because he abandoned his job and ignored directives to attend meetings.

### 1. Plaintiff's Hiring and Initial Employment

Ivan Holtzer, a manager at Allstate, recruited Plaintiff in 2018 and hired Plaintiff in late December 2018.  (Pl. Dep. 38–42, 45.)  Plaintiff testified that, prior to being hired, Holtzer told Plaintiff that he "[p]redominantly" wanted Plaintiff to sell life insurance and that Plaintiff "could also sell other products but his goal was for me to sell life insurance."  (Pl. Dep. 40.)  Upon his hiring, Plaintiff initially reported to Holtzer and was responsible for the Queens region.  (Pl. Dep. 45.)

Plaintiff attended a week of training in Chicago at the end of January 2019.  (Pl. Dep. 48–49.)  Before Plaintiff left for the training, Holtzer told Plaintiff that he was leaving his position and that Vincent Ferrara would now become Plaintiff's manager and direct supervisor.  (Pl. Dep. 47–49.)  Upon Plaintiff's return from Chicago, he worked under Ferrara. (Pl. Dep. 48.)  Ferrara—who was already supervising the salesmen in Nassau and Suffolk Counties—took over the Queens territory from Holtzer.  (Ferrara Dep. 18.)

Plaintiff was required to pass the FINRA Series 6 and Series 63 examinations within three months of starting his employment.[3]  (Ferrara Dep. 62–63; Def. Ex. B.)  Plaintiff passed the Series 6 exam at some point, but never passed the Series 63 exam before being terminated in August 2019.  (See Pl. Dep. 88–89 ("I believe I had the Series 6 in February maybe.").)

---

[3]  In Plaintiff's response to Defendant's 56.1 Statement, Plaintiff asserts, without citation to any evidence, that this factual assertion is "disputed."  However, Plaintiff's only substantive response to Paragraph 19 is that "Defendant has produced to [sic] evidence that Plaintiff would be terminated be terminated if this exam was not passed."  (Pl.' 56.1 ¶ 19.)  Additionally, Plaintiff says nothing about the Series 63 exam in his brief.  There is ample, undisputed, evidence that Plaintiff was required to pass his Series 6 and Series 63 exams.  (Ferrara Dep. 62–63; Def. Ex. B at 3.)  Plaintiff appears to downplay the importance of selling products that required FINRA licenses, citing Holtzer's statement that Plaintiff would predominantly sell life insurance.  There is, however, no evidence that Holtzer ever told Plaintiff that he did not need to pass these exams.  Moreover, when Plaintiff was hired, Holtzer would have had no reason to believe that Plaintiff would be unable to pass these exams—Plaintiff previously held Series 6 and Series 63 licenses, but both had lapsed before hiring.  (Pl. Dep. 22–23.)

## 2. Leads Provided to Financial Specialists

Independently owned Allstate sales offices sell property and casualty insurance. (Ferrara Dep. 10, 27.) At their depositions, Plaintiff and Ferrara sometimes referred to these sales offices as "stores."

Ferrara would introduce financial specialists to the owners of Allstate sales offices. (Ferrara Dep. 17–18, 28.) Financial specialists were then supposed to sell life insurance and other products to the customers of those Allstate offices. (Ferrara Dep. 17–18, 28.) A financial specialist was not allowed to solicit the customers of a sales office unless Ferrara gave them permission and introduced them to the owner of that sales office. (Pl. Dep. 55–57.) Specialists could work with more than one sales office. However, once Ferrara introduced a specialist to a specific office owner, other specialists could not solicit that office's customers. (Ferrara Dep. 28.) Ferrara decided which financial specialists to introduce to specific owners.[4] (Ferrara Dep. 30.)

Ferrara would introduce newly hired financial specialists, such as Plaintiff, to only two or three owners during their first year. (Ferrara Dep. 76–77.) There is no evidence in the record that any newly hired financial specialists ever received more than two or three owner introductions during their first year.

During Plaintiff's eight-month tenure at Allstate, he was introduced to two store owners in Queens and was supposed to sell products to customers of those owners. (Ferrara Dep. 38, 65, 73–74.)

---

[4] If a veteran specialist already had an established relationship with a sales office, that specialist was allowed to maintain that relationship even if Ferrara had not originally made the introduction. (Ferrara Dep. 28.)

Holtzer had introduced Schwartz to one store owner named Martin Levy.  (Ferrara Dep. 38.)  Schwartz was also introduced to another store owner named Michael Kalkin.[5]  (Ferrara Dep. 38–39.)

At some point after these introductions were made, Ferrara spoke with Levy and Kalkin. They both told Ferrara that they were working with Plaintiff, who would come into the office "a few hours a week," but "nothing is happening."  (Ferrara Dep. 55.)  In February 2019, Levy called Ferrara and told him that he had not seen Schwartz in a while.[6]  (Ferrara Dep. 75.)

As for Kalkin, Plaintiff met with him a few times and may have called one of Kalkin's clients.  (Pl. Dep. 66–67, 92.)

Ultimately, Plaintiff did not sell a single product during his eight-month tenure at Allstate.

Plaintiff complains that Ferrara discriminated against him by not introducing him to additional owners.  Ferrara testified that he did not consider referring any additional owners to Plaintiff because:  (1) he did not hear from Plaintiff again after speaking with him on the phone in March; and (2) Plaintiff had not completed his Series 63 exam.  (Ferrara Dep. 66.)

### 3.  Meetings

Ferrara held monthly in-person meetings in-person with his sales staff.  (Ferrara Dep. 34–36, 39; Pl. Dep. 48–49.)

---

[5]  Plaintiff admits that he was introduced to Kalkin and subsequently communicated with him.  It is not clear whether Holtzer or Ferrara made this introduction.  Plaintiff testified that Ferrara may have introduced him to Kalkin.  (Pl. Dep. 66 ("[Kalkin] may have been the only individual that Ferrara introduced me to, I believe."); id. at 73 ("Ferrara never introduced me to anyone other than Kalkin.").  Ferrara testified that Plaintiff was first introduced to Kalkin by Holtzer.  (Ferrara Dep. 39, 44–45.)

[6]  At his deposition, Plaintiff did not dispute Ferrara's testimony about Levy.  Plaintiff did not deny that Holtzer introduced him to Levy.  Nor did Plaintiff deny that he stopped interacting with Levy in February.  It is also notable that Plaintiff has not offered any deposition testimony from Levy, Kalkin, or Holtzer.

Ferrara testified that Plaintiff attended two in-person meetings—a monthly meeting in January and a meeting about variable annuities that was also held in January.[7]  (Ferrara Dep. 39, 46.)  According to Ferrara, Plaintiff failed to attend any subsequent in-person meetings.  (Ferrara Dep. 49–50.)  As discussed infra, Ferrara also testified about phone calls he had with Plaintiff in February and March.  Ferrara maintains that he never spoke to Plaintiff again after the March phone call.

Plaintiff disputes some of Ferrara's testimony about the meetings.  Plaintiff insists that he attended at least three in-person meetings with Ferrara.  Plaintiff testified that he attended three of Ferrara's monthly meetings—one in January, one in February, and one that occurred in either late February or early March.[8]  (Pl. Dep. 48–54.)  Plaintiff also testified that he and Ferrara both attended a large regional meeting, which may have been held in April.  (Pl. Dep. 57–58, 68, 92.)

According to Plaintiff, at the in-person meetings he attended, he tried to set up an individual meeting with Ferrara.  At the end of some of the group meetings, Plaintiff would also ask Ferrara to introduce him to store owners.  (Pl. Dep. 56.)  At the end of the meeting in early February, Plaintiff approached Ferrara and asked when they could meet.  (Pl. Dep. 50.)  Ferrara responded that he had an obligation and needed to leave, and that he would call or email Plaintiff.  (Pl. Dep.

---

[7]  According to Ferrara, at this meeting, he spoke with Plaintiff and told him that he could not sell these annuities because he had not yet passed his Series 6 exam.  (Ferrara Dep. 46.)  Ferrara also told Plaintiff that should be selling life insurance through "Martin [Levy] and Michael [Kalkin]" until he obtains his license.  (Id.)  At his deposition, Plaintiff did not deny that he attended a meeting concerning annuities and had this conversation with Ferrara.

[8]  In his opposition brief, Plaintiff asserts that he attended every group meeting between January and May.  (Pl. Mem. at 5.)  None of the deposition testimony Plaintiff cites in his brief indicates that he attended a monthly meeting in April.  While not specifically cited in Plaintiff's brief, the Court notes that Plaintiff did testify that, after the meeting in late February or early March, Plaintiff and Ferrara both attended a large regional meeting—which may have been held in April—where they spoke again.  (Pl. Dep. 57–58, 68, 92.)  At his deposition, Plaintiff also gave vague testimony about possibly attending a meeting in May, but he could not actually recall when this meeting occurred.  (See Pl. Dep. 92 ("It may have gone on through May.  June I know it was over.  But it may have been an early May meeting.  I'm not sure.  I don't remember the dates"); Pl. Dep. 58 ("Maybe [I attended] one more meeting in May or June.")  Based on this evidence, a reasonable jury could not find that Plaintiff attended a meeting in May.  Even assuming arguendo that a jury could conclude that Plaintiff attended a meeting in May, Defendant would still be entitled to summary judgment.

49–50.)  At the end of the next meeting, Plaintiff approached Ferrara again and Ferrara again told

Plaintiff that he would call him to set up a meeting.  (Pl. Dep. 51–52.)  According to Plaintiff, he

had similar interactions with Ferrara at every meeting he attended from February onward.  (Pl.

Dep. 54–55, 58–59.)

### 4.  Ferrara's Comment About Plaintiff's Age and Religion

Plaintiff maintains that when he spoke to Ferrara at the end of either the second or third

group meeting, Ferrara asked Plaintiff if he spoke Spanish.  (Pl. Dep. 54–55.)  When Plaintiff

responded that he only spoke Yiddish, Ferrara said "I don't think I would have hired an old Jewish

guy for my territory."[9]  (Pl. Dep. 55.)

### 5.  Ferrara's Phone Calls with Plaintiff

At one point in his deposition, Plaintiff states that although Ferrara told him on multiple

occasions that he would set up an individual "meeting" with Plaintiff, Ferrara never set up this

meeting.  (Pl. Dep. 55, 58.)  However, Plaintiff admitted at his deposition that he did have at least

one phone call with Ferrara.  (Pl. Dep. 59 ("There may have been a phone call."); Pl. Dep. 93 "He

would call me.  I would call him.  Somewhere along the line we did speak").)

Ferrara testified that, sometime in February, Ferrara spoke to Plaintiff and asked why he

had not made any sales.  (Ferrara Dep. 45.)  Plaintiff responded that he had not been able to get

through to any clients.  (Ferrara Dep. 45.)  As noted earlier, sometime in February 2019, Levy had

called Ferrara and told Ferrara that he had not seen Schwartz in a while.  (Ferrara Dep. 75.)

Ferrara also testified that, after reaching out to Plaintiff multiple times, he finally got

Plaintiff on the phone again sometime in March 2019.  (Ferrara Dep. 51, 61.)  When Ferrara asked

Plaintiff "what's going on," Plaintiff told Ferrara that he was in California to deal with "personal

---

[9]  Ferrara denies making this comment.  (Ferrara Dep. 47.)

things." (Ferrara Dep. 61.)  Ferrara responded that "it would have been nice if you let me know that." (Id.)  When Ferrara asked Plaintiff if he had let the "agents"—Kalkin and Levy—know that he went to California, Plaintiff replied that he had not.  (Id.)  Ferrara told Plaintiff that he should reach out to "both" of the agents and let them know.  (Id.)  Ferrara also asked Plaintiff when he would be returning from California and Plaintiff replied that he did not know.  (Id.)  Ferrara told Plaintiff to get in touch with him when returned from California.  (Id.)  Ferrara also brought up the fact that Plaintiff did not yet have his securities license.  (Id. at 62–63; Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13.)

Plaintiff did not dispute Ferrara's account of these two phone calls at his deposition.  In fact, Plaintiff admits that he had at least one phone call with Ferrara and that, as Ferrara recounted, Plaintiff was, indeed, in California.  (Pl. Dep. 59 ("There may have been a phone call."); id. at 93 "He would call me.  I would call him.  Somewhere along the line we did speak"); Pl.'s 56.1 ¶ 11.)

Ferrara maintains that Plaintiff never contacted him again after this phone call in March.  (Ferrara Dep. 62, 67.)  Plaintiff, however, testified that he attended at least one meeting with Ferrara that would have been after this call.

### 6. Plaintiff's August 2019 Termination

On August 5, 7, 8, and 9, Ferrara left messages for Plaintiff, who did not respond to the messages.  (Def. Ex. D Letter; Pl. Dep. 91 (not disputing Ferrara's calls).)  On August 8, 2019, Ferrara emailed Allstate's HR Department to discuss Plaintiff's possible termination.  (Def. Ex. E.)  In an August 12, 2019 email to HR, Ferrara recounted that:  (1) Plaintiff had made no sales since he was hired; (2) Plaintiff had failed to pass his Series 63 exam within 90 days; and (3) Plaintiff did not respond to Ferrara's communications.  (Id.)

Nancy Feustel, who worked in Allstate's HR department, then sent Plaintiff a letter dated August 13, 2019 outlining various deficiencies in his performance, including his failures to respond to Ferrara and the fact that Plaintiff "disappeared" from Kalkin's sales office after showing up for a few weeks.  (Def. Ex. E.)  Feustel's letter informed Plaintiff he had to attend a meeting with Ferrara on August 15 and that if he failed to attend the meeting, Allstate would consider his employment to be voluntarily terminated.  (Id.)  Plaintiff testified that after he received an email from Feustel about this meeting with Ferrara, he contacted her and informed her that he would not attend the meeting because it was a "hostile work environment."  (Ferrara Dep. 65–66, 70–71.)

After Plaintiff failed to attend this meeting, Feustel emailed Plaintiff, directed him to attend a meeting with Ferrara on August 19, and again told him that failure to attend would be considered a voluntary termination.  (Def. Ex. F.)  Plaintiff failed to attend that meeting as well.  On August 21, 2019, Allstate sent Plaintiff a letter informing him that Allstate deemed his actions to be a voluntary resignation.  (Def. Ex. G.)

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Caretta, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'"

while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). The non-moving party must produce "significant probative evidence" demonstrating that a factual dispute does in fact exist, otherwise summary judgment is appropriate. Anderson, 477 U.S. at 249.

**B. Standard for Religious and Age Discrimination Claims**

Under the Title VII, the ADEA, and the NYSHRL, employers cannot discriminate against employees based on their religion or their age. 42 U.S.C. § 2000e–2(a)(1); 29 U.S.C. § 621 et seq., see also N.Y. Exec. Law § 296. Claims of employment discrimination brought pursuant to Title VII, the ADEA and NYSHRL are analyzed under the familiar burden-shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015); Fu v. Consol. Edison Co. of New York, Inc., 855 F. App'x 787, 789 (2d Cir. 2021).

"Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010) (citation omitted). This means Plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 83 (2d Cir. 2015).

"Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason" for the adverse employment action. Ruiz, 609 F.3d at 491. If the defendant meets this low bar, "[t]he plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). "'[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (quoting Burdine, 450 U.S. at 253). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

For his religious discrimination claims, Plaintiff must ultimately prove that his religion was a motivating factor behind the adverse action. Vega, 801 F.3d at 5. For his age discrimination claims, Plaintiff must ultimately prove that his age was a but-for cause of the adverse action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).

14

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the [employer's] explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves, 530 U.S. at 147.  Where a plaintiff offers evidence of pretext, courts must take a "case-by-case approach" and examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143).  Whether summary judgment is appropriate depends on "a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" on a motion for summary judgment.  Reeves, 530 U.S. at 148–49.  As the Court in Reeves noted, even if "the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation," judgment as a matter of law may still be appropriate, where, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  Id. at 148.

## C.  **Analysis of Plaintiff's Discrimination Claims**

Plaintiff contends that he was discriminated against based on his age and religion.  However, in his opposition brief, Plaintiff does not assert that he is pursuing a discrimination claim based on his termination or alleging that he was constructively discharged.  Instead, Plaintiff simply asserts that the adverse action he suffered was Ferrara's refusal to provide him with leads for six months.  (Pl.'s Mem. at 9.)  Accordingly, Plaintiff has waived and abandoned any claims that his termination was discriminatory or that he was constructively discharged because of his

religion or age.  In any event, Plaintiff does not have viable discrimination claims premised on Ferrara's refusal to provide him with additional leads or on his ultimate termination.  Below, the Court analyzes Plaintiff's claims based on both the facts that have been deemed admitted and the full factual record.

### 1. Analysis of the Discrimination Claims Based on the Facts that Have Been Deemed Admitted

Given Plaintiff's failure to properly dispute the facts set out in Defendants' 56.1 statement, the Court has deemed admitted certain facts.  Additionally, Plaintiff has not submitted a counterstatement of any additional facts that complies with Local Rule 56.1.

Based on this record, Plaintiff cannot establish that Ferrara's refusal to provide him with additional leads constitutes an adverse action, (see discussion infra), or that Ferrara's failure to provide Plaintiff with additional leads was motivated or caused by Plaintiff's age or religion.

Plaintiff also cannot establish that he was constructively discharged.  Additionally, even assuming that Plaintiff was terminated, Plaintiff's discrimination claims about his termination fail.[10]  Based on this record, Plaintiff cannot show that he was discriminated against based on his religion or his age.  Indeed, these undisputed facts affirmatively indicate that Plaintiff was terminated due to job abandonment.  See Genova v. Cnty. of Nassau, 851 F. App'x 241, 244 (2d Cir. 2021) (affirming district court's grant of summary judgment where, after Plaintiff failed to file a 56.1 statement, the district court deemed admitted the fact that plaintiff was terminated for poor work performance and then concluded, based on this admitted fact, that the plaintiff could not "rebut the County's proffered legitimate nondiscriminatory reason for his termination as pretext").

---

[10]  It is not clear that Plaintiff was actually terminated by Allstate.  Rather, he appears to have resigned by abandoning his job.  In any event, even assuming that the circumstances here could still qualify as a termination, Plaintiff's claims about his "termination" all fail.

Accordingly, the Court grants Defendant summary judgment on Plaintiff's discrimination claims.  As explained below, even if the Court were to consider the entire record, Defendant would still be entitled to summary judgment.

**2.   Analysis of Plaintiff's Discrimination Claims Based on the Entire Record**

*i. Ferrara's Refusal to Provide Additional Leads*

Plaintiff contends that Ferrara's refusal to provide him with additional leads constitutes an adverse employment action.  The Court, however, finds that this was not an adverse employment action and, even if it were, Plaintiff cannot show that Ferrara's refusal was discriminatory.

"[T]o establish a materially adverse employment action on the basis of a denial of a lead, a commission-compensated plaintiff must establish that there was an unequal distribution of lucrative leads or that she had a basis for entitlement to that particular lead."  Capek v. BNY Mellon, N.A., No. 15-CV-4155, 2018 WL 1353269, at *7 (S.D.N.Y. Mar. 15, 2018).  Here, a reasonable jury could not find that there was an unequal distribution of leads or that Plaintiff had an entitlement to a particular lead.

Ferrara would introduce new financial specialists to only two or three owners during their entire first year.  (Ferrara Dep. 76–77.)  The record does not indicate that any financial specialists—whether newly hired or long-tenured—received more than two or three introductions to store owners in a single year.  Of course, Plaintiff did not even work at Allstate for a full year. He was formally employed for less than eight months.  The record does not indicate that any newly hired financial specialists received more than two introductions during the first eight months of their employment.  Moreover, Plaintiff never passed his Series 63 exam.  There is no evidence in the record that any newly hired financial specialist received more than two introductions before passing all required exams.  As such, Plaintiff cannot show that there was an unequal distribution

17

of leads.   See Matias v. Sears Home Improvement Prod., Inc., No. 08-CV-340, 2009 WL 10670308, at *5 (M.D. Fla. Sept. 9, 2009) (finding plaintiff did not suffer an adverse action when he "offered no evidence relating to the amount of prime leads he received as compared to other consultants") aff'd, 391 F. App'x 782 (11th Cir. 2010).

Plaintiff's brief notes that Ferrara gave "leads to other employees in a similar position to Plaintiff, and in fact was looking to hire other employees." (Pl. Mem. at 7.)  In support, Plaintiff cites only to an admission by Ferrara that he hired at least one new financial specialist between January 2019 and August 2019.  (Ferrara Dep. 70–71.)  This evidence does not help Plaintiff establish that he suffered an adverse action.  First, there is no evidence indicating when, exactly, these new employees were hired.[11]   Second, any new employees were hired to cover Suffolk County and Plaintiff had only informed Ferrara that he would work in Nassau County.  (Ferrara Dep. 47, 71.)  There is no evidence that, during Plaintiff's tenure, there were sales office owners in Queens and Nassau County that Ferrara could have introduced to Plaintiff.   Third, even assuming arguendo that Plaintiff could have been considered for owner introductions in Suffolk County, there is no evidence about the number of introductions provided to specialists who were hired between January and August.[12]   Given the above, Plaintiff cannot show that there was an unequal distribution of leads and, thus, cannot establish that he suffered an adverse employment action.

There is also no evidence about the quality of leads provided to other specialists, which makes it impossible to compare Plaintiff and the other specialists on that basis.  Cf. Matias v. Sears

---

[11] Notably, Plaintiff made no efforts to communicate with Ferrara for months prior to his termination and, in August, ignored Ferrara's communications and Feustel's orders that he attend meetings.

[12] Plaintiff seems to assume that any available leads should have been distributed to him before Allstate could hire new specialists and that new specialists should only be hired when existing specialists could not handle any additional work.  There is, however, nothing in the record indicating Ferrara or Holtzer followed such a practice.

Home Improvement Prod., Inc., 391 F. App'x 782, 786 (11th Cir. 2010) (finding no adverse action where Plaintiff failed to establish that the leads he received were from materially less affluent prospects). Additionally, there is undisputed evidence in the record that Levy and Kalkin reported to Ferrara that Plaintiff was not diligently pursuing their customers and stopped showing up. Moreover, even putting that evidence aside, Plaintiff's claim that Kalkin was a "dead" lead does not help him establish that he suffered an adverse action or, ultimately, that he was discriminated against. Even assuming that Ferrara was the one who decided to give Plaintiff the "Kalkin" lead,[13] there is nothing in the record to suggest that Ferrara knew this was a poor lead when he gave it to Plaintiff. Ferrara had no prior experience in Queens and had only taken over the territory in January 2019. (Ferrara Dep. 11–12, 18, 25.) And, the record does not contain any objective data about Kalkin's sales office that would have indicated to Ferrara that this was a poor lead prior to Plaintiff's introduction to Kalkin.

Even if Plaintiff could establish that Ferrara's refusal to provide additional leads constitutes an adverse action, a reasonable jury could not find that this action was discriminatory. Ferrara testified that he did not consider referring any additional owners to Plaintiff because: (1) he did not hear from Plaintiff again after speaking with him on the phone in March; and (2) Plaintiff had not completed his Series 63 exam. (Ferrara Dep. 66.) Additionally, as discussed above, Ferrara also explained that he would only introduce new financial specialists to two or three store owners during their first year. (Ferrara Dep. 76.)

Even assuming arguendo that Ferrara's comment raises an inference of discrimination for purposes of a prima facie case, Plaintiff cannot ultimately establish that his failure to receive

---

[13] To the extent that Holtzer—rather than Ferrara—initially provided this lead, Plaintiff does not claim that Holtzer discriminated against him. Notably, Holtzer—who recruited and hired Plaintiff—was also the manager responsible for introducing Plaintiff to Levy.

additional introductions was motivated by his religion or caused by his age.  Although there is a factual dispute about whether Plaintiff attended certain meetings, Ferrara also explained that he did not consider referring additional owners to Plaintiff because Plaintiff had not yet passed his Series 63 exam.  It is undisputed that Plaintiff did not pass this exam within 90 days and had still not passed this exam when he was terminated in August.  The fact that Plaintiff had not passed his required Series 63 exam was, itself, an independent and compelling reason to not provide Plaintiff with any additional introductions.  Plaintiff had already been given two introductions.  Ferrara had numerous other financial specialists working for him and—even if Ferrara had another unaffiliated owner who he could have introduced to Plaintiff—it would have made little sense to provide Plaintiff with another introduction when Plaintiff had not yet passed his Series 63 exam.  It is also notable that there is no evidence in the record that any newly hired financial specialist was given more than two introductions <u>prior</u> to the specialist passing all of the required exams.  This evidence does not indicate that Ferrara's reasons were a pretext for religious or age discrimination.

Based on the evidence above, a reasonable jury could not find that Ferrara's refusal to provide Plaintiff with additional owner introductions was motivated by his religion or because of his age.

      *ii.  Termination*

As explained earlier, Plaintiff abandoned and waived any claim that his termination was discriminatory.  In any event, any claim that Plaintiff's termination was discriminatory fails.

Even assuming <u>arguendo</u> that Plaintiff has raised an inference of discrimination for purposes of a <u>prima</u> <u>facie</u> case, he cannot ultimately establish that his termination was motivated by his religion or caused by his age.

Plaintiff cannot establish that Allstate's proffered reason for his termination was pretextual. After Plaintiff failed to respond to multiple communications from Ferrara in early August, Plaintiff was directed to attend two meetings and was informed that failure to attend would result in his termination. Plaintiff failed to appear and was terminated for job abandonment. No reasonable jury could find that Plaintiff's termination was motivated by his religion or caused by his age.

**D.  Analysis of Plaintiff's Hostile Work Environment Claims**

**1. Plaintiff Waived and Abandoned His Hostile Work Environment Claim**

Plaintiff's complaint alleges a claim for a hostile work environment. Plaintiff, however, waived and abandoned this claim by failing to adequately address and argue this claim in his brief. In the context of discussing Plaintiff's discrimination claims, Plaintiff sets out the four elements that a plaintiff must meet to establish a prima facie case of discrimination, including that the plaintiff suffered an adverse action and that the adverse action occurred under circumstances that give rise to an inference of discrimination. (Pl. Mem. at 8–11.) In the section that discusses the inference of discrimination, Plaintiff also quotes, without further discussion, the standard for evaluating hostile work environment claims. (Id. at 10–11.) After setting out this standard, Plaintiff does not assert that he was subjected to a hostile work environment and or explain how the facts of this case meet the standard for a hostile work environment. (Id. at 11.) Instead, Plaintiff simply asserts that Ferrara's antisemitic "comment, coupled with the lack of employment and earning capabilities by a supervisor that did not hire Plaintiff proves discriminatory intent and creates a clear question of fact requiring denial of this motion." (Id.) This is not sufficient to raise a hostile work environment claim. Accordingly, this claim is dismissed. In any event, any hostile work environment claims also fail on the merits, whether based on the facts that have been deemed admitted or the entire record.

**2. Standard**

To establish a hostile work environment, a plaintiff must show that "show that the conduct she complains of:  (1) 'is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) 'creates an environment that the plaintiff perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [protected characteristic].'"  Langlois v. Hartford Bd. of Educ., 831 F. App'x 548, 551–52 (2d Cir. 2020) (quoting Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007)).  The existence (or non-existence) of a hostile work environment must be "measured by the totality of the circumstances." Chandler v. AMR Am. Eagle Airline, 251 F. Supp. 2d 1173, 1185 (E.D.N.Y. 2003) (citing Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999).  Among the factors that courts consider are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance."  Feingold v. N.Y., 366 F.3d 138, 150 (2d Cir. 2004) (internal Feingold, 366 F.3d at 150 (quoting Harris, 510 U.S. at 23).

**3. Analysis**

Plaintiff's claim he was subjected to a hostile work environment based on his religion and/or age clearly fails based on the facts have been deemed admitted.

Even if the Court were to consider the entire record, Plaintiff's hostile work environment claim consists, at best, of Ferrara's single "old Jewish guy" comment, Ferrara's failure to meet individually with Plaintiff, and Ferrara's refusal to provide Plaintiff with additional leads.  A reasonable jury could not find that this conduct was sufficiently objectively severe or pervasive to create an environment that a reasonable person would find hostile or abusive.  See Clarke v. InterContinental Hotels Grp., PLC, No. 12 CIV 2671, 2013 WL 2358596, at *10 (S.D.N.Y. May

30, 2013) (finding that the plaintiff failed to allege that her workplace was "sufficiently abusive" where "her supervisors snubbed her; spoke to her rudely to her and insulted her worth ethic; excessively scrutinized her work; and gave her more work to do than other employees").

This conclusion is further buttressed by the Court's earlier discussion concerning Ferrara's refusal to provide Plaintiff with additional leads. As stressed previously, Ferrara would introduce new financial specialists to only two or three store managers during their entire first year. (Ferrara Dep. 76–77.) The record does not indicate that Plaintiff received fewer (or lower quality) introductions than any specialists with comparable tenure or similar licenses. Accordingly, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claims.

### 4. Constructive Discharge

As explained earlier, Plaintiff waived and abandoned any potential constructive discharge claim. Moreover, a constructive discharge claim would fail on the merits in any event.

"Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" Fincher v. Depository Tr. & Clearing Corp., 604 F.3d at 725 (2d Cir. 2010) (quoting Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). "This standard is higher than the standard for establishing a hostile work environment." Fincher, 604 F.3d at 725.

As Plaintiff cannot establish a hostile work environment, any constructive discharge premised on that allegedly hostile work environment claim necessarily fails. Moreover, any constructive discharge claim also fails because the record indicates that Allstate was attempting to set up a meeting between Ferrara and Plaintiff to re-establish a relationship. Plaintiff complains that Ferrara failed to meet with him, (see Pl. Dep. 49–50), and then, when Allstate's HR department set up a meeting with Ferrara, Plaintiff did not show up.

### E. **Retaliation**

#### 1. **Standard for Retaliation Claims**

Title VII, the ADEA, and the NYSHRL prohibit retaliation against employees who engage in protected activity under those statutes. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d); N.Y. Exec. Law § 296(e). These retaliation claims are analyzed under the essentially same burden-shifting framework as Plaintiff's discrimination claims. Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir. 2015).

To establish a prima facie case of retaliation, plaintiff must demonstrate: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment.'" Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (quoting McMenemy v. City of Rochester, 241 F.3d 279, 282–83 (2d Cir. 2001)).

A plaintiff can establish a causal connection either: "'(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant.'" Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)). "After the defendant responds with a non-retaliatory reason for the adverse employment action, the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." Ya-Chen Chen, 805 F.3d at 70 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013).

### 2. Analysis

#### i. Overview

Plaintiff's retaliation claims clearly fail based on the facts that been deemed admitted, which do not even indicate that Plaintiff engaged in any protected activity. Additionally, those facts affirmatively establish that Plaintiff was, in fact, terminated due to job abandonment.

Even if the Court were to consider the entire record, Plaintiff's retaliation claims still fail. First, Plaintiff's brief asserts that he engaged in protected activity by "filing a claim for discrimination with the EEOC on September 18, 2019." (Pl.'s Mem at 12.) However, this protected activity is not viable basis for a retaliation claim as Plaintiff's employment ended on August 21, 2019, <u>before</u> this filing with the EEOC.

Second, to the extent Plaintiff claims that he was retaliated against for a raising a complaint with Allstate's HR Department, such retaliation claims are meritless.

#### ii. Evidence of Plaintiff's Alleged Complaint to HR

Before analyzing Plaintiff's retaliation claim concerning his complaint to HR, it is helpful to flesh out the relevant evidence on this issue in greater detail.

Plaintiff's allegations about his purported complaint to HR are vague. Plaintiff's complaint in the instant litigation—which, of course, is not admissible evidence—alleges that:

> [a]fter 8 months of not being provided any customer leads, Plaintiff complained to Allstate Human Resources, specifically Nancy Feustel. . . . Specifically, Plaintiff advised Ms. Feustel that he was being subjected to a hostile work environment based on his religion and age.

(Compl. ¶¶ 37–38.) Similarly, Plaintiff's opposition brief states that he informed Feustel in August 2019 that he was subject to a hostile work environment. (Pl.' Mem. at 3.) In support of his

retaliation claim, Plaintiff's brief cites to a single page of deposition testimony.  (See Pl. Mem. at

3, 7, 11–13.)

When questioned about this purported complaint at his deposition, Plaintiff gave the

following vague testimony:

Q:  Okay. All right. So going back to interactions with Ms. Feustel, you said that there was an email regarding setting up a meeting with Vince and that you had contacted her back and said that you were not attending the meeting because it was a hostile work environment, is that – that's correct?

A:  Right, yes.

Q:  Were there any other interactions between you and Ms. Feustel?

A:  I'm not sure how many times she communicated with me because it was always the same conversation; no more than a handful. It was at the diminument of my employment.

Q:  And was this all via email or did you talk to her over the phone?

A:  If I had one phone conversation, it would have been the same conversation, same thing, same tenor. It was unremarkable to me. So I don't recall.

****

Q:  Okay. All right. Can you look at Paragraph 36 [of the Complaint], please.

A:  Yes, after eight months of not being provided any customer leads, plaintiff complained to Allstate human resources, specifically Nancy Feustel.

Q.  Now, is the complaint referenced in Paragraph 36 the email that you referenced regarding not meeting with Ferrara because it was a hostile work environment?

A:  Yeah.

Q:  Were there any other communication that you were referencing from Paragraph 36?

A:  No.  Are you asking if I delineated to Feustel about Ferrara's comment about my age and Religion?

Q:  No. I'm asking if there were any other communications other than the email that you previously testified about to Ms. Feustel complaining about a hostile work environment?

A:  It was -- the email and as I said, I may have had one phone conversation with her. I

Don't recall.

Q:  And you say it -- turning to Paragraph 36 that you advised Ms. Feustel that you were being subjected to a hostile work environment based on your religion and age.  Did you ever specifically say that to her?

A:  Feustel didn't speak to me and I didn't I didn't contact her.  I wasn't proactively contacting her.  She spoke to me, I believe, after Ferrara determined that I was going to be terminated and asked her to call me.  That's the genesis of my relationship with her.  What I said to her exactly, I don't know.  I don't remember a hundred percent.  At that point already the relationship between myself and Allstate was over.  I'm not sure what she was trying to accomplish, but, you know, the job that I was told I had I knew I no longer had and that's when Feustel got in the middle and it was at the end of that relationship with Allstate.

(Ferrara Dep. 65–66, 70–71 (emphasis added.)

As explained below, based on these facts, Plaintiff's retaliation claims fail.

iii.  *Plaintiff Has Not Established the Second Element of His Prima Facie Case*

An employee engages in protected activity "by opposing a practice made unlawful" by Title VII.  Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir.1998). "The ADEA contains a nearly identical provision prohibiting retaliation for complaining of employment discrimination on the basis of age, see 29 U.S.C. § 623(d), and the same standards and burdens apply to claims under both statutes."  Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006).

"[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by" Title VII, the ADEA, and the NYSHRL. Galdieri-Ambrosini, 136 F.3d at 292; see Pfizenmayer v. Hicksville Pub. Sch., 700 F. App'x 64, 65–66 (2d Cir. 2017).

Even if a reasonable jury could conclude that Plaintiff complained to Feustel about a "hostile work environment" in August 2019, a jury could not conclude that Allstate was aware that

Plaintiff was complaining about a hostile work environment <u>based on his age and religion</u>. Plaintiff did not testify that he mentioned—either orally or in an email[14]—Ferrara's alleged "old Jewish guy" comment to Feustel or said anything to her about his age or religion. Accordingly, Plaintiff cannot establish the second element of his <u>prima</u> <u>facie</u> case. See <u>Durant v. Union Loc. 237</u>, No. 12-CV-1166, 2013 WL 1232555, at *8 (E.D.N.Y. Mar. 4, 2013) ("Plaintiff's explicit invocation of the term 'hostile work environment' in one complaint was not sufficient to put the [defendant] on notice because nothing in that complaint suggested that the alleged harassment was based on [the plaintiff's] protected characteristics or any protected activity."); <u>Foster v. Humane Soc'y of Rochester & Monroe Cnty., Inc.</u>, 724 F. Supp. 2d 382, 395 (W.D.N.Y. 2010) ("[T]he mere fact that plaintiff used the term 'hostile environment' in her email to her supervisor is not enough; the court must look at the substance of her complaint, not the terminology that she used."); <u>see</u> <u>also</u> <u>Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.</u>, 716 F.3d 10, 15 (2d Cir. 2013) (finding that the plaintiff failed to plausibly allege that defendant would have understood her complaints—which included complaints of "harassment"—were about discrimination based on the plaintiff's sex or some other trait).

### iv.  Plaintiff Cannot Establish that His Termination was Retaliatory

Plaintiff's retaliation also fails because there is insufficient evidence to establish a causal connection for purposes of a <u>prima</u> <u>facie</u> case and there is  clearly insufficient evidence for a jury to ultimately conclude that Plaintiff was terminated because he complained to Feustel.

Even assuming that Plaintiff was terminated (and did not simply resign by abandoning his job), Plaintiff's retaliation claims about his "termination" fail.

---

[14]  The record does not contain a copy of any email from Plaintiff complaining about a hostile work environment.

While temporal proximity is sometimes sufficient to establish a causal connection for purposes of a prima facie case, when all of the circumstances are considered here, a reasonable jury could not find that Plaintiff's termination was retaliatory. Plaintiff's deposition testimony indicates that Feustel emailed him, and that in response to her email, Plaintiff complained—either via email or orally—about a "hostile work environment." That timing, however, does not suggest retaliation.

Ferrara raised issues about Plaintiff's deficiencies and performance with HR prior to Plaintiff's complaint. Feustel then became involved and directed Plaintiff to attend a mandatory meeting. All of this occurred prior to Plaintiff's complaint. Plaintiff only complained after Feustel had already directed him to attend a mandatory meeting and warned him that failure to attend would result in his termination. (See Def. Ex. D.) Given these circumstances, Plaintiff cannot establish a causal connection based on temporal proximity.

Finally, Plaintiff cannot establish that Allstate's proffered reason for his termination–namely, that he abandoned his job by failing to attend the meetings in August—was a pretext for retaliation. Plaintiff was directed to attend two meetings and was informed that failure to attend would result in his termination. Plaintiff failed to appear and was terminated. No reasonable jury could find that Plaintiff's termination was caused by his protected activity.

### III. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's motion for summary judgment. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: March 31, 2023
Central Islip, New York                                     _____/s/  (JMA)_____
                                                            JOAN M. AZRACK
                                                            UNITED STATES DISTRICT JUDGE